UNITED STATE DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

No. 3:26-cv-113

| | |
|---|---|
| BRIANA CICERO-JOHNS, individually and as guardian of E.J., a minor child, and S.J., a minor child,<br><br>      Plaintiffs,<br><br>v.<br><br>SOCRATES ACADEMY, INC., KRISTALYN IANNIELLO, ASHLEY MINDA, VANESSA BAKER, STEFANIE SAVAGE, JOHN COUCHELL, and DEMETRIOS POURLOS,<br><br>      Defendants. | **COMPLAINT**<br><br>[Jury Trial Demanded] |

1.      Dr. Briana Cicero-Johns is the mother of two children that attend Socrates Academy, Inc. ("Socrates Academy"), a public charter school in Mecklenburg County, North Carolina. Dr. Cicero-Johns's daughter, E.J., joined Socrates's basketball team and excelled—despite Socrates's disparate treatment of the girls basketball team as compared to the middle school boys basketball team. Dr. Cicero-Johns, upon first noticing the disparate treatment between the sexes, raised her concerns to Socrates's athletic directors. When no corrective action was taken, she escalated her concerns to Socrates's principal. No corrective action was taken, no investigations were made, and instead, Dr. Cicero-Johns was publicly chastised before other parents, faculty, and staff members. Once again, Dr. Cicero-Johns escalated her concerns, this time to Socrates's Board of Directors. Instead of

investigating the matter or taking any corrective action, Socrates and its staff, employees, and leaders punished Dr. Cicero-Johns, E.J. and Dr. Cicero-Johns's son, S.J., who also attends Socrates, in unlawful retaliation for Dr. Cicero-Johns's complaints. Such conduct violated Plaintiffs' rights under state and federal equal protection, anti-discrimination, and free speech law. This action follows.

<u>Parties</u>

2.      Dr. Cicero-Johns is a citizen and resident of North Carolina.

3.      E.J. is a student at Socrates Academy and is a citizen and resident of North Carolina.

4.      S.J. is a student at Socrates Academy and is a citizen and resident of North Carolina.

5.      Dr. Cicero-Johns is the parent and legal guardian of E.J. and S.J.

6.      Socrates is a public charter school and non-profit corporation, organized and existing under the laws of North Carolina with its principal place of business in Mecklenburg County, North Carolina.

7.      Kristalyn Ianniello is a citizen and resident of North Carolina. Ianniello served as Socrates's middle school athletic director from at least August 2023 until she resigned in the Spring of 2025.

8.      Ashley Minda is a citizen and resident of North Carolina. Minda served as Socrates's high school athletic director and physical education teacher from at least August 2023 until she resigned on February 13, 2025.

9.     Vanessa Baker is a citizen and resident of North Carolina. Baker was Socrates's principal/Head of School from at least August 2023 through the present. She has tendered her resignation, effective February 27, 2026.

10.     Stefanie Savage is a citizen and resident of North Carolina. Savage served as Socrates's Head of Lower School (K—5th grade) and Title IX Coordinator from at least August 2023 until, upon information and belief, February 27, 2026. Following Baker's departure as Head of Lower School, she will assume the title of Interim Head of School.

11.     John Couchell is a citizen and resident of North Carolina. At all times relevant, Couchell served as Socrates's President of the Board of Directors.

12.     Demetrios Pourlos is a citizen and resident of North Carolina. At all times relevant, Pourlos served as Socrates's Dean of Students.[1]

Jurisdiction and Venue

13.     The Court has jurisdiction over the subject matter of this action pursuant to section 1331 of Title 28 of the U.S. Code as this action involves claims that arise under federal law.

14.     The Court has personal jurisdiction over Defendants because all Defendants reside in North Carolina and the conduct alleged herein occurred in North Carolina.

---

[1] Pourlos communicates with parents as "Dean of Students" but is referenced on Socrates's website as the Dean of Scholars.

15. Venue is proper in this Court pursuant to 18 U.S. Code §§ 1391(b)(1) and (b)(2).

Waiver of Immunity

16. Defendants are not immune from liability for the claims asserted in this action.

17. Alternatively, if Defendants would otherwise be immune from such liability, Defendants have waived such immunity through the purchase of insurance or participation in a risk pool under conditions that would entitle Defendants to indemnification by or through such insurance or risk pool for the claims asserted in this action.

Facts

18. Socrates is a public charter school located in Matthews, North Carolina.

19. Socrates, in exchange for its compliance with state and federal statutes, receives funding from both the State of North Carolina and the federal government.

20. E.J. and S.J. began attending Socrates in August 2023, when E.J. was in the fifth grade and S.J. was in the second grade. Dr. Cicero-Johns was drawn to Socrates because of its small class sizes, which E.J. would directly benefit from.

21. E.J. is diagnosed with certain behavioral disabilities, including attention deficit/hyperactivity disorder ("ADHD") and Sensory Processing Disorder. E.J. and her family have worked significantly and deliberately to ensure that those disabilities do not hinder E.J.'s ability to succeed in all facets of her life, including

E.J.'s education and participation in sports. Dr. Cicero-Johns believed that Socrates's smaller class sizes would benefit E.J.'s continued growth and learning.

22.    In October 2024, E.J. joined Socrates's middle school girls basketball team.

23.    In or around November of 2024, Socrates purchased new basketball uniforms for both the girls' and boys' basketball teams and issued them to each team on November 7 or 8, 2024.

24.    E.J.'s new uniform fit her well and E.J. was able to proudly wear the new uniform at Socrates's basketball prep rally. This was important for E.J. because of E.J.'s sensory processing disorder. Specifically, clothing material can cause E.J. to react physically to the material, including elevating her heart rate, causing hyper-fixation, and prohibiting her from focusing on anything but the offending material.

25.    Just four days later, on November 12, 2024 —and thirty minutes before the first game of the season—Ianniello and Minda collected the girls' new uniforms from the team and gave them to the boys middle school basketball team. Ianniello and Minda then provided the girls team with uniforms that were at least six years old and reflected their age and use.

26.    When Dr. Cicero-Johns asked Ianniello and Minda why the new uniforms were taken back from the girls team, Minda gave unsupported excuses that the uniforms were too big for the girls, that the girls weren't comfortable wearing them, and that the old ones were used for the girls because the old ones "run smaller."

27.    And when Dr. Cicero-Johns asked Ianniello and Minda about these unsupported excuses, particularly as neither Ianniello nor Minda had spoken with the majority of the girls' team before unilaterally giving away their uniforms, Minda responded "We are not going to have this conversation. This is not up for a vote. As athletic director, I make the decisions and this is the best decision for the entire athletic department. We are not discussing this anymore."

28.    The next day, on November 13, 2024, Dr. Cicero-Johns and E.J. attended Socrates's board of directors meeting to voice their concerns regarding the disparate treatment that girls' team received as compared to the boys' team. Dr. Cicero-Johns specifically raised her concerns to the board that Socrates and its staff, coaches, and employees, were violating Title IX and asked the board to take action to ensure that Socrates would comply with Title IX.

29.    The board took no action. Again, on November 14, 2024, the girls played their second game in the old uniforms. When E.J. asked Minda during class why the uniforms were taken away, Minda responded angrily, screamed at E.J. in front of her classmates, and told E.J. she had "told [her] Mom 1000 times".

30.    For the first two home games of the 2024 season, E.J. wore the old basketball uniforms. E.J. was a starter for both games and made significant contributions, leading in scoring, rebounds, and assists. As a result of E.J.'s contributions, the girls' team took home one of the only wins of the season. E.J. also played well during the team's first away game, scoring several points. The team lost, but E.J.'s efforts staged a comeback and nearly secured the win.

31.    On November 21, 2024, Dr. Cicero-Johns raised her concerns related to the uniforms to Socrates's administration through a message via ParentSquare, again asking Socrates to remedy the uniform problem. Socrates took no action, and later that day, the girls team played its third game in the old uniforms.

32.    On November 22, 2024, for the first time, Socrates's principal, Baker, informed Dr. Cicero-Johns that the uniforms were taken away because of sizing issues with Socrates's uniform vendor. Rather than cause Socrates to rectify the issue, and ensure fair treatment for both the girls and boys basketball teams, Baker suggested that the parents of the girls on the team should fundraise to purchase the girls team new uniforms.

33.    At the third game of the season, and first away game, E.J. struggled to self-regulate her sensory processing order and hyper-focus on the feeling of the heavy, hot, and uncomfortable material of the old uniforms. The away team's gym was extraordinarily hot and E.J. had a physical reaction to the heat and the old uniforms that resulted in her not being able to enter the game. After support from her parents and adjusting to the heat and uniforms, E.J. was able to play in the second half. However, E.J. was distraught with the incident and sobbed the entire way home from the game.

34.    To mitigate these problems as much as possible, Dr. Cicero-Johns and E.J. scheduled a fitting for the old uniform so that it would be comfortable for E.J. to wear and play in, and to address issues related to E.J.'s sensory processing disorder. Dr. Cicero-Johns and E.J. did not request a change in the uniforms for this

accommodation, choosing instead to personally incur the expenses associated with customizing the uniform for E.J.

35.     But Dr. Cicero-Johns and E.J. never had the opportunity to meet with their tailor. On November 25, 2025, immediately before a game, Baker, Ianniello, and Minda finally returned the new uniforms to the girls team. Unfortunately, Baker, Ianniello, and Minda chose to return the uniforms by taking them directly from the boys and giving them to the girls in unwashed, stained condition, immediately before a game. The girls team played that game in those unwashed, dirty uniforms. When other parents complained about the switch, Baker blamed their actions on Dr. Cicero-Johns, telling the other parents "there was an allegation the girls were being discriminated against by not having the new uniforms."

36.     The uniform episode is just one example of the many ways in which Socrates discriminated unfairly against the girls basketball team.

37.     During the 2024-2025 season, the girls team was coached by Shelton. Upon information and belief, Shelton has never played or coached basketball and was unqualified for the position. His lack of experience starkly contrasted with the two individuals hired to coach the boys team, both of whom had previous experience as basketball players and coaches.

38.     Shelton did not teach (or even attempt to teach) standard skills including any press, press break, offensive play, zone or man-to-man defensive scheme, or even any inbounds play. Practices consisted mostly of having the girls stand in a line and take turns shooting free throws. And during games, Shelton would

simply stand behind the bench with his arms crossed without ever interacting with the players. The boys coach, by contrast, taught his players all of these concepts, and actively coached each game, calling plays, calling timeouts, and providing thoughtful encouragement to his players.

39.     The girls also received unequal practice and gym time. At the start of the 2024 season, Socrates had both the girls middle school and high school junior varsity teams practice in the same gym at the same time. As a result, each team had only half a court to practice on.

40.     Unsurprisingly, Socrates allowed the middle school boys team to use the entire gym for its practices. When confronted by Dr. Cicero-Johns, Baker responded in a message on ParentSquare that the practice issues resulted from "space limitations". Baker provided no explanation as to why these "space limitations" only negatively impacted the girls team.

41.     Despite this treatment, E.J. loved playing basketball. E.J.'s self-determination and family support helped her hone her skills, and E.J. looked forward to growing as a basketball player.

42.     Prior to the uniform issue, E.J. was awarded significant playing time. For example, during the first game, she played for nearly the entire 24-minute game.

43.     But after Dr. Cicero-Johns raised her concerns to Socrates, E.J.'s treatment by school staff, including Shelton, dramatically changed.

44.     Shelton immediately began decreasing E.J.'s playing time. E.J. had previously averaged 24 minutes. After Dr. Cicero-Johns raised her concerns, Shelton

reduced E.J.'s playing time to 1-2 minutes per game (even in blow outs, where other less experienced players were typically afforded more playing time).

45.     When Dr. Cicero-Johns asked Shelton why he had benched E.J., Shelton told Dr. Cicero-Johns that it was because "she has come to practice multiple times asking adult-sourced questions, [including] 'how long have you been coaching, and where else have you coached?'" On another occasion, Shelton told E.J. directly that she didn't get to play anymore because she was "too short."

46.     E.J.'s season ended, and despite Dr. Cicero-Johns consistent requests for a Title IX investigation, for fair treatment for the girls team, or for a qualified coach, Socrates took no action.

47.     Instead, Socrates blamed the uniform issue on Dr. Cicero-Johns, telling other parents that the unwashed and stained uniforms were returned in that condition (i.e., unwashed and stained) because of Dr. Cicero-Johns's "allegation" that the girls were being discriminated against. In so doing, Socrates caused a direct rift between Dr. Cicero-Johns and E.J. and other parents and students, hoping to silence and ostracize Dr. Cicero-Johns for raising her concerns.

48.     E.J., a sixth grade middle school student, was forced to endure being indefinitely benched for a sport she loved, yelled at and publicly reprimanded by Minda, subjected to gender-based microaggressions by Minda in class and at practices, and scapegoated by Baker in a manner that led other parents to direct hostility toward Dr. Cicero-Johns and S.J. All of these actions were taken in direct

response to Dr. Cicero-John and E.J. raising concerns related to the disparate treatment of the girls basketball team.

49.     In February of 2025, Minda was forced to resign from her employment as a result of misconduct related to interactions with players on an opposing basketball team. Dr. Cicero-Johns hoped that with Minda's removal, E.J. would have a fresh start in the upcoming season, and Socrates's past discriminatory practices would be rectified.

50.     To help ensure that the Title IX issues were addressed, Dr. Cicero-Johns sent email requests, as required by the board's submission process, to address the board of directors at their monthly meeting in December 2024, January 2025, February 2025, and March 2025. Dr. Cicero-Johns was informed through Socrates's social media profile that she was not allowed to speak because no one had submitted her request to speak. Later, she was informed that Socrates's "submission process was not working."

51.     Finally, at the April 9, 2025, board meeting, Dr. Cicero-Johns's request to speak was approved, and she was allowed to address the board of directors to raise her concerns about the Title IX issues and the direct way that Socrates's failure to remedy those issues had affected her family. Before Dr. Cicero-Johns was permitted to speak, however, Couchell, made qualifying statements to the members of the board and other attendees that Socrates had "investigated everything and there [was] no finding of any discrimination or retaliation against [E.J.]."

52.     Couchell's statement was false. Socrates had not conducted any investigation.

53.     On August 13, 2025, the board of directors held a virtual board meeting that was open to parents. Dr. Cicero-Johns and other parents logged into the meeting 30 minutes early and observed someone they believed to be an attorney conducting a training, reminding the board of directors of their Title IX obligations.

54.     With this apparent new commitment to Title IX compliance in place, E.J. geared up for the 2025-2026 basketball season.

55.     The hope that Socrates would take its Title IX obligations seriously, and would invest the same time, effort, and resources into the girls basketball team as it did the boys, was shattered at the start of the 2025 season.

56.     On November 5, 2025, once again, the girls basketball team was given the old stained and ill-fitting uniforms. And once again, the boys team received the new uniforms.

57.     The next day, on November 6, 2025, Socrates hosted a zoom call with parents for the purpose of having a "conversation" with school administrators. During that meeting, many parents (including Dr. Cicero-Johns) asked questions about the uniform situation and raised concerns that Socrates was again violating its obligations under Title IX.

58.     When confronted, Baker made new excuses for their lack of compliance. Now, Baker blamed the failure to address the uniform issue solely on "funding" issues.

59.     On November 10, 2025, E.J. created a petition to the board to request that adequate funding be allocated to both the boys and girls basketball teams to purchase new uniforms. As E.J. put it, the goal was not to "argue about who deserves what" but rather, to support both the boys and girls teams fairly.

60.     In response, on November 12, 2025, Socrates conducted another zoom meeting hosted by the Athletic Subcommittee of the Board, which only allowed parents to listen and not comment, discussing fundraising efforts and how the parents (who had already donated significantly to Socrates's athletic programs) had to fund the shortfall needed to ensure that Socrates could provide adequate equipment, including uniforms, to the girls team.

61.     To date, Socrates has not provided equal treatment to both the boys and girls basketball teams, including failing to provide equal uniforms and practice time. Although Socrates hired a new coach for the girls basketball team, Socrates terminated that coach the day of a scheduled game (without proper notice) despite protests from the teams' parents.

62.     On November 20, 2025, Dr. Cicero-Johns was approached by another teacher at Socrates—this time, S.J.'s teacher.

63.     S.J. is currently a fourth-grade student at Socrates.

64.     In passing, S.J's teacher informed Dr. Cicero-Johns that S.J. was "playing too roughly at recess," and he was "written up" as a result.

65.     After the school day ended, S.J. informed Dr. Cicero-Johns that he would receive after school detention based on his conversation with Pourlos. Later that day,

Pourlos emailed Dr. Cicero-Johns and informed her that S.J would receive in-school suspension for the same conduct which he told S.J. that S.J. would receive detention.

66. When confronted about why the punishment changed, Dr. Cicero-Johns was told by Pourlos that the punishment never changed and that the in-school suspension was the only punishment that was ever contemplated. Dr. Cicero-Johns requested a meeting to discuss S.J's punishment issue.

67. On December 1, 2025, Dr. Cicero-Johns met with Savage, Pourlos, and S.J.'s teacher. At that meeting, Pourlos informed Dr. Cicero-Johns for the first time that Pourlos had changed the punishment only after Pourlos had met with his "leadership team." When Dr. Cicero-Johns asked for the names of the members on the "leadership team," Pourlos refused to answer. Dr. Cicero-Johns learned later from Savage that Savage and Baker were the leadership team members who influenced the changed outcome.

68. On December 17, 2025, Socrates's board of directors held their monthly meeting. Prior to the meeting, Dr. Cicero-Johns submitted an online submission to address the board and was told by Baker that she would be allowed to speak.

69. The day of the meeting, Dr. Cicero-Johns was not included on the meeting agenda. And when Dr. Cicero-Johns attempted to log into the Zoom meeting, she was not let in by the Socrates administrator running the Zoom call. Despite a parent informing Socrates (during the Zoom call) that Dr. Cicero-Johns was in the meeting room waiting to be let in, Socrates did not allow her to join the meeting until her third attempt to join the meeting. Once allowed in, Couchell disparaged Dr.

Cicero-Johns and informed her, in front of all attendees, that Dr. Cicero-Johns needed to be "respectful and not call out anyone by name" – despite never having engaged in similar conduct previously. After Couchell's rant, Dr. Cicero-Johns was permitted to speak for approximately two minutes.

70. On December 19, 2025, Dr. Cicero-Johns received a letter from Socrates via e-mail informing her that she was banned from campus for the remainder of the school year, which ends June 30, 2026.

71. Specifically, Socrates has forbidden Dr. Cicero-Johns from attending school events on or off campus (including away games), and the only exception to the campus ban is that she can use the carpool line for drop off and pick up; however, she is not permitted to get out of the car. Lastly, scheduled and approved parent/teacher conferences must be held virtually rather than in person.

72. Since being banned from campus, Dr. Cicero-Johns has been prevented from attending several events, including S.J.'s school trips (where she has assigned to chaperone), E.J.'s basketball games and concerts, and even to pick up her son, S.J., when he fell ill during the middle of the school day.

73. Worse, Socrates has continued to disparage Dr. Cicero-Johns and her family. Recently, Socrates posted images of Dr. Cicero-Johns and her daughter (taken off of Dr. Cicero-Johns's social media profiles) at the front desk of the school with letters in bold saying "BANNED BANNED BANNED". Socrates intentionally selected images showing Dr. Cicero-Johns's employer, even including an image displaying E.J.'s face:



*Figure 1: Cropped Image of Posters Hung at Socrates's Front Desk*

74.     Visitors to the school can easily view the paper sized images of Dr. Cicero-Johns and her daughter and take photos of the same. Dr. Cicero-Johns was notified of these images by a family friend who received the photos from their child, S.J.'s classmate at Socrates.

75.     Not only has the family suffered emotional and educational harm for raising valid concerns and seeking necessary corrective action, but Dr. Cicero-Johns has also suffered financial harm as a result of Socrates's campaign to ostracize her.

<u>Claim 1 – Violation of the Equal Protection Clause</u>
(Against all Defendants)

76.     Plaintiffs incorporate the above allegations by reference.

77.     Socrates is a charter school that receives federal and state financial assistance, such that it is obligated to comply with the United States Constitution and the North Carolina Constitution.

78.     Defendants, acting on behalf of, or as agents of, Socrates are obligated to comply with the United States Constitution and the North Carolina Constitution.

79.     Defendants have engaged in, and perpetuated, the following behavior or pattern of behavior of disparate treatment based on gender:

a. Providing subpar equipment and uniforms to the middle school girls basketball team than the middle school boys basketball team;

b. Providing disproportionate practice time to the middle school girls basketball team as compared to that offered and provided to the middle school boys basketball team;

c. Hiring inexperienced coaches and staff for the middle school girls basketball team as compared to hiring qualified coaches for the middle school boys basketball team;

d. Taking away benefits, including uniforms, from the middle school girls basketball team and using those benefits and resources for the middle school boys basketball team; and,

e. Retaliating against students and parents who have raised concerns related to such disparate treatment.

80. With regard to Plaintiffs, Defendants have acted under color of law and have deprived Plaintiffs, who are citizens of the United States, to equal treatment.

81. As a direct and proximate result, Plaintiffs have suffered damages in an amount to be determined at trial.

Claim 2 – Violation of Title IX of the Education Amendments of 1972
(Against all Defendants)

82. Plaintiffs incorporate the above allegations by reference.

83. Socrates and Socrates Foundation operate educational programs that currently receive, and at all relevant times have received, federal financial assistance.

84. Title IX of the Educational Amendments of 1972 provides in relevant part, "No person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

85.     The Title IX implementing regulations prohibit a recipient of Federal financial assistance from subjecting any person on the basis of sex to discrimination, including "[p]rovid[ing] different aid, benefits, or services" and "[s]ubject[ing] any person to separate or different rules of behavior, sanctions, or other treatment[.]" 34 C.F.R. §§ 106.31(a) and (b)(4).

86.     Socrates has denied Plaintiffs the benefits of educational programs and activities and subjected them to discrimination on the basis of gender, in violation of Title IX, 20 U.S.C. §1681(a) and 34 C.F.R. §106.31(a).

87.     Specifically, Socrates has engaged in, and perpetuated, the following behavior and/or pattern of behavior:

    a.  Providing subpar equipment and uniforms to the middle school girls basketball team than the middle school boys basketball team;

    b.  Providing disproportionate practice time to the middle school girls basketball team as compared to that offered and provided to the middle school boys basketball team;

    c.  Hiring inexperienced coaches and staff for the middle school girls basketball team as compared to hiring qualified coaches for the middle school boys basketball team;

d. Taking away benefits, including uniforms, from the middle school girls basketball team and using those benefits and resources for the middle school boys basketball team; and,

e. Retaliating against students and parents who have raised concerns related to such disparate treatment.

88. As a direct and proximate result, Plaintiffs have suffered damages in an amount to be determined at trial.

Claim 3 – Violation of N.C. Gen. Stat. § 115C-218.55
(Against all Defendants)

89. Plaintiffs incorporate the above allegations by reference.

90. Under North Carolina law, charter schools "shall not discriminate against any student on the basis of ethnicity, national origin, gender, or disability." Legally recognizing that charter schools, including Socrates, must provide its students the fundamental right to equal treatment.

91. As described herein, Socrates has discriminated against students on the basis of gender, by, among other things, allocating resources, funding, equipment, and access to qualified coaches to the middle school boys basketball team that is disparate to Socrates's treatment of the middle school girls basketball team.

92. As a direct and proximate result, Plaintiffs have suffered damages in an amount to be determined at trial.

Claim 4 – First Amendment Retaliation
(Against all Defendants)

93. Plaintiffs incorporate the above allegations by reference.

94. Dr. Cicero-Johns and E.J. engaged in constitutionally protected conduct under the First Amendment, namely, raising concerns and asking for investigation of the Title IX violations described herein. This speech was constitutionally protected, and involved speech related to matters of public concern.

95. In response, Defendants took adverse action against Plaintiffs including:

    a. Reducing E.J.'s playing time and benching her for the remainder of the 2024-2025 basketball season;

    b. Making disparaging and disrespectful comments to other parents, students, and staff about Dr. Cicero-Johns, including blaming Dr. Cicero-Johns for the uniform issues;

    c. Escalating S.J.'s unrelated punishment from a "write up" to an in-school suspension after consulting with Socrates's "leadership team"; and,

    d. Banning Dr. Cicero-Johns from Socrates's campus, prohibiting her from attending her children's events, including E.J.'s basketball games, and E.J and S.J's school trips.

96. These actions were motivated by, and taken directly after, Dr. Cicero-Johns engaged in protected conduct, including, but not limited to, questioning Socrates's staff and employees about its policies related to Title IX compliance, raising concerns to Socrates's board of directors about Title IX compliance and the disparate treatment of the girls basketball team, and asking Socrates to take remedial action to rectify the non-compliance.

97.     These actions would not have occurred absent retaliatory motive.

98.     These actions would, and did, deter a person in ordinary circumstances from continuing to voice concerns about Socrates's compliance with Title IX and other federal laws.

99.     As a direct and proximate result, Plaintiffs have suffered damages in an amount to be determined at trial.

Prayer for Relief

WHEREFORE, Plaintiffs respectfully pray that the Court award it the following relief:

1.     Entry of appropriate preliminary and permanent injunctive relief to remedy Defendants' unlawful conduct, including prohibiting Defendants continuing to take retaliatory action against Plaintiffs;

2.     Trial by jury as to all matters so triable;

3.     Compensatory damages in an amount to be determined at trial;

4.     Pre- and post-judgment interest on any award of damages to the extent allowed by law;

5.     Costs incurred in this action, including but not limited to reasonable attorneys' fees to the extent allowed by law; and,

6.     Such other relief as the Court deems just and proper.

This 12th day of February, 2026.

Respectfully,



By:  /s/ Bo Caudill
      Bo Caudill
      NC Bar No. 46281
      bocaudill@villmercaudill.com
      Tomi M. Suzuki
      NC Bar No. 55561
      tomisuzuki@villmercaudill.com
      Precious McLaughlin
      NC Bar No. 59869
      preciousmclaughlin@villmercaudill.com
      VILLMER CAUDILL, PLLC
      P.O. Box 18186
      Charlotte, NC 28218
      Tel: 704-216-8120
      Fax: 704-705-8191
      *Counsel for Plaintiffs*